398 F.2d 900
 MARINE STEVEDORING CORPORATION, and Liberty Mutual Insurance Company, Appellants,
v.
Jerry C. OOSTING, Deputy Commissioner, United States Employees' Compensation Commission, Fifth Compensation District, Appellee.
William H. JOHNSON, Appellant,
v.
John P. TRAYNOR, Deputy Commissioner, U. S. Department of Labor, and Nacirema Operating Co., Inc., a body corporate, Appellees.
Julia T. KLOSEK, widow of Joseph J. Klosek, Deceased Employee, Appellant,
v.
John P. TRAYNOR, Deputy Commissioner, U. S. Department of Labor, and Nacirema Operating Co., Inc., a body corporate, Appellees.
Albert AVERY, Appellant,
v.
Jerry C. OOSTING, Deputy Commissioner, United States Employees' Compensation Commission, Fifth Compensation District, and Liberty Mutual Insurance Company, Appellees.
 No. 10060.
 No. 10298.
 No. 10299.
 No. 10323.
 United States Court of Appeals Fourth Circuit.
 Reargued February 5, 1968.
 Decided June 20, 1968.
 Certiorari Granted December 9, 1968.
 
 See 89 S.Ct. 444.
 L. S. Parsons, Jr., Norfolk, Va. (John A. Field, III, and Parsons & Powers, Norfolk, Va., on brief), for appellants, Marine Stevedoring Corp. and Liberty Mutual Ins. Co.
 Leavenworth Colby, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, on brief), for appellee, Oosting.
 Jno. J. O'Connor, Jr., Baltimore, Md. (O'Connor & Preston, Baltimore, Md., on brief), for appellants, Johnson and Klosek.
 Leavenworth Colby, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and David Rose, Atty., Dept. of Justice, on brief), for appellee, Traynor.
 Randall C. Coleman, Baltimore, Md. (Thomas W. Jamison, III, Baltimore, Md., on brief), for appellee, Nacirema Operating Co., Inc.
 Jacob Rassner, New York City, on brief for International Longshoremen's Assn. as amicus curiae.
 Ralph Rabinowitz, Norfolk, Va. (Kelsey & Rabinowitz, Norfolk, Va., on brief), for appellant, Avery.
 Leavenworth Colby, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and David Rose, Atty., Dept. of Justice, on brief), for appellee, Oosting.
 William B. Eley, Norfolk, Va. (Rixey & Rixey, Norfolk, Va., on brief), for appellee, Liberty Mutual Ins. Co.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges, sitting en banc.
 SOBELOFF, Circuit Judge:
 
 
 1
 The common question presented by these cases consolidated for appeal[1] is whether injuries sustained by four longshoremen while working on the docks and engaged in three separate loading operations are compensable under the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C.A. § 901 et seq. In none of the cases are the facts in dispute; only the intended scope of the Act is contested.
 
 
 2
 In Marine Stevedoring v. Oosting, No. 10,060, a stevedoring company was under contract to handle the lines and cables in moving and mooring the S. S. JAMES E. HAVILAND. Vann, one of its employees, was lifting a cable off the stern bollard when it suddenly straightened, catapulting him off the pier and into the river where he drowned. Death benefits awarded by the deputy commissioner were affirmed by the District Court. 238 F.Supp. 78 (E.D.Va.1965).
 
 
 3
 In Nos. 10,298 and 10,299, Johnson and Klosek were members of a longshoremen's "gang" engaged in loading a cargo of steel beams aboard the S. S. BETHTEX, moored to the Bethlehem Steel High Pier, Sparrows Point, Maryland. They had been assigned to the pier to work as "slingers or hook-on men," and it was their job to board the railroad gondola cars used to carry the beams onto the pier and to fasten drafts to the ship's crane in preparation for loading. At the time of the accident, as the crane raised a draft out of the car, it began to rotate. One end of the draft caught Klosek, lifted him from the car and dropped him head first onto the pier, killing him, while the other end struck Johnson and crushed him against the side of the car. The deputy commissioner denied the claim brought by Klosek's widow and also the claim submitted by Johnson, who had sustained disabling injuries. The District Court affirmed, holding that the injuries had not occurred within the jurisdictional scope of the statute. 243 F.Supp. 184 (D.Md. 1965).
 
 
 4
 Like Klosek and Johnson, Avery, in No. 10,323, was working as a slinger in a gondola car attaching drafts of logs to a ship's crane for loading. He too was severely injured when a swinging draft pinned him against the side of the car. For the same reasons as in Klosek and Johnson, he was denied relief under the Longshoremen's Compensation Act. The District Court affirmed.
 
 
 5
 Each of the injured men was a member of a "gang" of approximately twenty assigned by his employer to work on a particular vessel. As was the practice at the ports where these injuries occurred, the entire gang reported to the vessel and two to four of the men were then ordered back onto the pier to work as "slingers or hook-on men" during the loading operation.[2] The job performed by the men on the pier is basically the same as the work done by their fellow longshoremen on board. Indeed, it is not uncommon for the men to rotate positions and continually pass back and forth between ship and wharf during a given operation. Indisputably, at the time of each accident the injured longshoremen were engaged in maritime employment on a high pier at a point several hundred feet from shore. Further, it has been stipulated that the piers in question extended into navigable waters and were sufficiently high to permit the passage of small boats and barges under them.
 
 
 6
 The Longshoremen's and Harbor Workers' Compensation Act provides in relevant part that:
 
 
 7
 "Section 3
 
 
 8
 (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law."
 
 
 9
 The issue before us is whether an injury on a pier falls within the jurisdictional provision "upon the navigable waters," and thus within the coverage of the Act.
 
 
 10
 The answer is found in part in the history of this legislation. Ten years before the passage of the Act, the Supreme Court held that longshoremen injured on vessels or on gangplanks between vessels and piers were exclusively within federal maritime jurisdiction and thus barred from recovery under state compensation acts. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); Clyde S. S. Co. v. Walker, 244 U.S. 255, 37 S.Ct. 545, 61 L.Ed. 1116 (1917). Subsequent efforts by Congress to extend the benefits of existing state acts to maritime injuries were struck down as unconstitutional delegations of the legislative powers of Congress.[3] Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); State of Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). In its third attempt to provide compensation for the yet uncovered longshoremen, Congress in 1927 enacted the Longshoremen's Compensation Act.[4]
 
 
 11
 Denominated "an act to provide compensation for disability or death resulting from injuries to employees in certain maritime employment," 44 Stat. 1424, the Act embodies a comprehensive compensation plan for all longshoremen engaged in "loading, unloading, refitting, and repairing ships," on navigable waters. S.Rep. No. 973, 69th Cong., 1st Sess., p. 16. As originally drafted, the bill provided coverage for injuries "on a place within the admiralty jurisdiction of the United States, except employment of local concern and no direct relation to navigation or commerce." S. 3170 & H. R. 9498. Although enthusiastic about its general objectives, representatives of both the unions and the shipping industry uniformly voiced dissatisfaction with the bill's jurisdictional provison. At the Committee hearings, a union spokesman pointed out that as originally drawn, the effect of the bill would necessarily be harmful to repairmen and longshoremen who continually pass back and forth between state and federal jurisdiction, each exclusive of the other. Hearings on S. 3170, Senate Judiciary Committee, 69th Cong., 1st Sess., March 16 and April 2, 1926, pp. 29-31. In the same vein, spokesmen for the shipping industry complained that the bill was not sufficiently inclusive and urged that the final bill "include all maritime employment under the admiralty jurisdiction." Senate Hearings, pp. 95-101. A representative of the Labor Department also appeared and testified that Congress had sufficient power to enact a compensation statute that would extend to all injuries to maritime workers occurring "on the dock, on the bridge and in the ship," and on behalf of the department argued for an amendment to the bill that would provide "coverage of the contract and not coverage of the men in one spot, performing one part of the contract." Senate Hearings, pp. 40-41.
 
 
 12
 The lone dissident voice was that of the International Association of Industrial Accident Boards and Commissions, author of the pending bill and the Acts previously declared unconstitutional. It sought to maintain the limited scope of the bill, leaving as much as was constitutionally permissible to the states.
 
 
 13
 At the conclusion of the hearings, the bill was revised and submitted to Congress in its present form. While no further explanation of the various revisions is to be found in either the committee reports or congressional debates, it is certainly reasonable to infer that the modifications represent an acquiescence in the broader coverage sought by almost all witnesses and, consequently, a rejection of the narrow jurisdictional position espoused by the IAIABC.
 
 
 14
 Beyond question, Congress could constitutionally ground jurisdiction on the function or status of the employees, as the Labor Department urged, and thus extend coverage to all longshoremen injured during the loading, unloading, repairing or refitting of vessels regardless of the situs of the injury. See The Admiralty Extension Act, 46 U.S.C.A. § 740 (1948);[5] Gutierrez v. Watermann S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); American Stevedores v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947); Sanderlin v. Old Dominion Stevedoring Corp., 385 F.2d 79 (4 Cir. 1967); Spann v. Lauritzen, 344 F.2d 204 (3 Cir. 1965); United States v. Matson Nav. Co., 201 F.2d 610 (9 Cir. 1953).[6] The question, therefore, is whether Congress fully exercised this power, as the injured longshoremen contend, or whether it incorporated in the revised bill the phrase "upon the navigable waters" specifically to freeze coverage to injuries occurring within the admiralty tort jurisdiction as it was thought to exist in 1927, as the stevedoring and insurance companies insist. While the definitive answer is not forthcoming from either the Act itself or its history, we find substantial support for the conclusion that Congress designed the Act to be status oriented, reaching all injuries sustained by longshoremen in the course of their employment.[7]
 
 
 15
 Prolonged discussion of this issue is now unnecessary, however, since it has been authoritatively resolved by the Supreme Court in Calbeck v. Travelers Insurance Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). Quoting with approval the Fifth Circuit in DeBardelen Coal Corp. v. Henderson, 142 F.2d 481 (1944), the Court stated:
 
 
 16
 "The elaborate provisions of the Act, viewed in light of prior Congressional legislation as interpreted by the Supreme Court, leaves no room for doubt, as it appears to us, that Congress intended to exercise to the fullest extent all the power and jurisdiction it had over the subject matter. * * * It is sufficient to say that Congress intended the compensation act to have a coverage co-extensive with the limits of its authority." 370 U.S. at 130, 82 S.Ct. at 1205. (Emphasis added.)
 
 
 17
 Those opposed to extending coverage in the instant case argue that Calbeck has no bearing since the Supreme Court was not concerned with the meaning of "upon the navigable waters," but was merely interpreting the phrase "if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by state law." In answer, we need only repeat Judge Palmieri's observation in Michigan Mutual Liability Co. v. Arrien, 233 F.Supp. 496, 501 (S.D.N.Y.1965), aff'd, 344 F.2d 640 (2 Cir. 1965), that "[w]hat is just as important as the actual holding in Calbeck is the general approach to the [Longshoremen's Compensation] Act taken by the Court. No longer is the Act viewed as merely filling in the interstices around the shore line of the state acts, but rather as an affirmative exercise of admiralty jurisdiction."
 
 
 18
 This affirmative exercise of the admiralty power of Congress "to the fullest extent" of its jurisdiction, creating "a coverage co-extensive with the limits of its authority," can only mean that Congress effectively enacted a law to protect all who could constitutionally be brought within the ambit of its maritime authority. Again, in the words of Judge Palmieri, "it thus appears that `upon navigable waters' is to be equated with `admiralty jurisdiction.'"
 
 
 19
 This interpretation of the Act, giving the injured longshoreman the broadest protection, not only fully complies with the mandate of the Supreme Court in Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953), that the Act be liberally construed, but also comports with the Court's observation in Calbeck, supra, 370 U.S. at 123, 82 S.Ct. at 1202, that the Act should be read to avoid the "uncertainty, expense, and delay of fighting out in litigation" the proper source of compensation, state or federal. As early as 1942, the Court sought to attain this objective by recognizing that the "undefined and undefinable" boundaries between state and maritime jurisdiction created a "twilight zone" of overlapping jurisdictions. Davis v. Department of Labor and Industries, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246. Aptly described by Judge Qua as "designed to include within a wide circle of doubt all water front cases involving aspects pertaining both to land and the sea where a reasonable argument can be made either way," Moores' Cases, 323 Mass. 162, 167, 80 N.E.2d 478, 481, aff'd sub nom. Bethlehem Steel Co. v. Moores, 335 U.S. 874, 69 S.Ct. 239, 93 L.Ed. 417 (1948), this "twilight zone" merely represented a judicial articulation of the presumption of coverage incorporated in the Act.[8]
 
 
 20
 An alternative route, advocated by some courts, would also extend coverage under the Act. Concluding that Congress had exercised the more limited tort jurisdiction, Judge Palmieri in Michigan Mutual, supra, and Judge Winter in Boston Metals v. O'Hearne, 1964 AMC 2351 (D.Md.1963), aff'd, 329 F.2d 504 (4 Cir. 1964), cert. denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964), nevertheless found that accidents that might previously have fallen outside the scope of the Act are covered by virtue of the expansion of the admiralty tort jurisdiction. They reasoned, in light of Calbeck that the phrase "upon navigable waters" in this remedial legislation was not limited to the tort jurisdiction as it was thought to have existed in 1927, but must be construed to include the full range of the legislatively and judicially expanded concept of maritime jurisdiction.[9] Thus, with the passage of the Admiralty Extension Act, the protection afforded by the Compensation Act was given an expanded construction covering pier-side injuries. Other cases that have read Calbeck to enlarge coverage under the Act include Interlake S. S. Co. v. Nielsen, 338 F.2d 879, 882-883 (6 Cir. 1965); Spann v. Lauritzen, supra;[10] Pudget Sound Bridge & Dry Dock Co. v. O'Leary, supra.[11]
 
 
 21
 Moreover, Calbeck is not the only Supreme Court decision pointing inescapably to this conclusion. In Reed v. Yaka, 373 U.S. 410, 415, 83 S.Ct. 1349, 1353, 10 L.Ed.2d 448 (1963), the Court reiterated its earlier mandate that "the Longshoremen's Act `must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.'"[12] This direction was then amplified by the explanation that "[i]t would produce a harsh and incongruous result, one out of keeping with the dominant intent of Congress to help longshoremen, to distinguish between liability to longshoremen injured under precisely the same circumstances * * *. [Those] subject to the same danger * * * [are] entitled to like treatment under law."[13] It is precisely such a harsh and incongruous result that the stevedores and their insurers now urge upon us.
 
 
 22
 We examine a number of these incongruities. First, as noted above, the injured longshoremen were members of a gang all of whom did basically the same work for the same pay and were subjected to the same risks, passing freely from ship to pier in the course of their work. All would concede that a longshoreman crushed by a rotating draft while working in a ship's hold would be entitled to recover under the Act. It would be intolerably harsh and incongruous to deny the same benefits to a longshoreman injured while performing the same task on an adjoining pier.
 
 
 23
 Secondly, courts have held that "upon navigable waters" covers injuries sustained by persons flying over the water, D'Aleman v. Pan American World Airways, 259 F.2d 493 (2 Cir. 1956); working under the water, Smith v. Brown & Root Marine Operators, Inc., 243 F. Supp. 130 (W.D.La.1965); repairing ships on dry docks or on the land around dry docks, Avondale Marine Ways, Inc. v. Henderson, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77 (1953); Holland v. Harrison Bros. Dry Dock & Ship Repair Yard, Inc., 306 F.2d 269 (5 Cir. 1962); and constructing dry docks, Newport News Shipbuilding & Dry Dock Co. v. O'Hearne, 192 F.2d 968 (4 Cir. 1951). The phrase "upon navigable waters" has also been held to cover injuries to longshoremen caught by the ship's gear, lifted momentarily from the pier, and dropped either into the slip or onto the pier itself, O'Keeffe v. Atlantic Stevedoring Company, 354 F.2d 48 (5 Cir. 1965); L'Hote v. Crowell, 54 F.2d 212 (5 Cir. 1931); Richards v. Monahon, 17 F.Supp. 252 (D.Mass.1936). In Interlake S. S. Co. v. Nielsen, supra, the Sixth Circuit upheld a judgment obtained on behalf of a maritime employee who drowned when he drove his car off the end of a pier. And presumably, the Act would further extend to a longshoreman injured in the waters immediately beneath the pier regardless of how he got there; but not, the stevedores here contend, to injuries sustained by maritime workers performing traditional maritime tasks, injured on a pier above the water.
 
 
 24
 The harshness and incongruity that would necessarily result in light of precedents above cited if we were to deny coverage to pier-side injuries like those with which we are here concerned is readily apparent from the disparate treatment of the four longshoremen in the instant case. Although all, at the time of their injuries, were performing similar jobs exposing them to similar risks, only Vann, who happened to fall into the water, and Klosek, who was momentarily lifted from the pier, would qualify under the Act. Such fine-spun distinctions are clearly condemned by Yaka, supra.
 
 
 25
 A third incongruity, that would be frozen into law if the contentions of the stevedores were to prevail, is apparent from broad liberal construction that has been applied to the term "dry dock," Holland v. Harrison Bros. Dry Dock & Ship Repair Yard, Inc., supra,[14] compared with the very narrow interpretation they would attach to the phrase "upon navigable waters." We perceive no rational justification for this diverse treatment.
 
 
 26
 Finally, the parties have stipulated that small vessels are able to navigate beneath the piers on which the accidents in the instant cases took place. These waters are therefore navigable in fact.[15] Since the jurisdictional scope of the phrase "upon navigable waters" extends to injuries occurring "above" such waters, see D'Aleman v. Pan American World Airways, supra, we are compelled to conclude that the injuries suffered by Vann, Johnson, Klosek and Avery were all sustained upon the navigable waters of the United States.
 
 
 27
 Regardless of the route traveled, we arrive at the conclusion that the injuries of all four longshoremen are embraced by the Act. In rejecting the arguments advanced by the stevedoring companies, we are mindful of the pertinent observations of Judge Soper, presaging the recent Supreme Court decisions, that "[t]he references therein to `maritime employment' and the injury `upon the navigable waters of the United States (including any dry dock),' should be broadly construed," and that the coverage of the Act "should not be frustrated by needless refinements." Newport News Shipbuilding & Dry Dock Co. v. O'Hearne, 192 F.2d 968, 971 (4 Cir. 1951).
 
 
 28
 We are well aware that the conclusions reached in this opinion have not been uniformly adopted in other circuits. See Houser v. O'Leary, 383 F.2d 730 (9 Cir. 1967); Travelers Insurance Company v. Shea, 382 F.2d 344 (5 Cir. 1967); Nicholson v. Calbeck, 385 F.2d 221 (5 Cir. 1967); but see, also in the Fifth Circuit, Holland v. Harrison Bros. Dry Dock & Repair Yard, Inc., supra. However, for the reasons fully developed herein, we decline to follow them.
 
 
 29
 We therefore affirm the judgment of the District Court upholding the deputy commissioner's award in Marine Stevedoring v. Oosting, No. 10,060, and reverse the judgments in Johnson, Klosek and Avery, Nos. 10,298, 10,299 and 10,323 which affirmed the denial of recovery and remand these cases for the entry of judgments consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 After being heard below as three separate cases, they were consolidated on appeal and were initially argued on February 9, 1966 before a panel of the court consisting of Haynsworth, Chief Judge, and Sobeloff, Circuit Judge, and Hutcheson, District Judge. At the request of the court, the cases were reargued en banc
 
 
 [2]
 At the time of their injuries, both Vann and Avery were employed at the port in Norfolk, Virginia. While the same practice is followed at the Maryland and Virginia ports, it often varies in other sections of the country. At some ports the assignment of men to particular positions is made on the basis of seniority, the most senior workers being assigned to the hold when the weather is bad and to the pier in good weather. At other ports, the men rotate throughout the day
 
 
 [3]
 Act of October 6, 1917, 40 Stat. 395; Act of June 10, 1922, 42 Stat. 634
 
 
 [4]
 Congress acted partly in response to the Supreme Court's invitation in State of Washington v. W. C. Dawson & Co., supra at 227, 44 S.Ct. at 305, to exercise its maritime powers in order to provide federal coverage for longshoremen: "Without doubt Congress has power to alter, amend or revise the maritime law by statutes of general application embodying its will and judgment. This power, we think, would permit enactment of a general Employers' Liability Law or general provisions for compensating injured employees; but it may not be delegated to the several states."
 
 
 [5]
 The Act provides:
 "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."
 
 
 [6]
 See also, Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3 Cir. 1964); Hagans v. Ellerman and Bucknall Steamship Co., 318 F.2d 563 (3 Cir. 1963); Puget Sound Bridge & Dry Dock Co. v. O'Leary, 260 F.Supp. 260, 264 (W.D. Wash.1966)
 
 
 [7]
 The Senate revisions, concurred in by the House, certainly met many of the objections raised by the witnesses; how far they went toward meeting the Labor Department's suggestion that the bill be status oriented is admittedly less clear
 The passage from the Senate Report, No. 973, 69th Cong., 1st Sess. 16, most often relied upon to support the narrow jurisdictional view that Congress intended to limit coverage to injuries occurring within the maritime tort jurisdiction as it was then thought to exist, excluding pier-side injuries, reads as follows:
 "The purpose of this bill is to provide for compensation, in the stead of liability, for a class of employees commonly known as `longshoremen.' These men are mainly employed in loading, unloading, refitting, and repairing ships; but it should be remarked that injuries occurring in loading or unloading are not covered unless they occur on the ship or between the wharf and the ship so as to bring them within the maritime jurisdiction of the United States."
 While it has been said that this passage suggests that the Senate Committee intended the Act to be situs oriented, it is no less reasonable to read the passage as extending the benefits of the Act to all who may be brought within the maritime jurisdiction. Moreover, other passages from the Reports of both Houses indicate that Congress was primarily concerned with the status of the potential claimants. For example, in the Senate Report, in the paragraph immediately following the oft-cited passage quoted above, it is stated:
 "If longshoremen could avail themselves of the benefits of State compensation laws, there would be no occasion for this legislation; but, unfortunately, they are excluded from these laws by reason of the character of their employment; and they are not only excluded but the Supreme Court has more than once held that Federal legislation cannot, constitutionally, be enacted that will apply State laws to this occupation." (Emphasis added.) S. Rep.No. 973, 69th Cong., 1st Sess. 16.
 To like effect is H.R.Rep.No. 1767, 69th Cong., 2d Sess. 20:
 "The principle of workmen's compensation has become so firmly established that simple justice would seem to require that this class of maritime workers should be included in this legislation * * *.
 The bill as amended, therefore, will enable Congress to discharge its obligation to the maritime workers placed under their jurisdiction by the Constitution of the United States by providing for them a law whereby they may receive the benefits of workmen's compensation and thus afford them the same remedies that have been provided by legislation for those killed or injured in the course of their employment in nearly every State in the union." (Emphasis added.)
 Or, as Congressman LaGuardia summed up:
 "This law simply gives the longshoremen the benefit of up-to-date legislation to cover injuries sustained in the course of their employment. That is all there is to it." 68th Cong.Rec. 5414.
 We are aware that the Fifth Circuit recently reached the opposite conclusion in Travelers Insurance Company v. Shea, 382 F.2d 344, 346 (1967), stating, "[t]he coverage of the Act is not keyed to function but has uniformly been situs-oriented," relying on its own opinion in O'Keeffe v. Atlantic Stevedoring Co., 354 F.2d 48, 50 (1965). A refutation of the asserted uniformity appears in the same circuit's decision in Holland v. Harrison Bros. Dry Dock & Repair Yard, Inc., 306 F.2d 369, 373 n. 4 (1962), that while "[t]he literal language of the Longshoremen's Act seems to concern only the locality of the accident, * * * the history of the Act indicates that its underlying purpose was to embrace the admiralty jurisdiction whatever that might be." We think that in the latter decision the Fifth Circuit expressed the correct view.
 
 
 [8]
 Section 920. Presumptions
 In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary —
 (a) That the claim comes within the provisions of this chapter.
 
 
 [9]
 While both judgments were affirmed, by the Second and Fourth Circuits, respectively, in neither case did the Court of Appeals find it necessary to reach this precise issue. There is dictum in the Second Circuit's opinion that an injury on the wharf might not qualify under the Compensation Act. Judge Kaufman, however, specifically reserved the question, stating: "In view of the reasons we have articulated for our holding we find it unnecessary to decide whether the award may also be sustained on the ground that the Admiralty Extension Act * * * enlarged the coverage of the Longshoremen's Act." 344 F.2d at 646 n. 4. Indeed, the opinion went on to observe thatCalbeck "has been interpreted, in every appellate decision where the question has arisen, as mandating that a federal compensation award must be upheld if there is a reasonable argument for coverage under the Longshoremen's Act." 344 F.2d at 646.
 
 
 [10]
 Although the issue was not before the court, we read the inclusion of a passage from Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), to the effect that "the Longshoremen's and Harbor Workers' Act was not intended to take away from longshoremen the traditional remedies of the sea, so that recovery for unseaworthiness could be had notwithstanding the availability of compensation," as an indication that the Third Circuit would have upheld an award to the longshoreman, who, in that case was injured on a pier by the handle of a hopper also located on the pier during the unloading of a vessel
 
 
 [11]
 To the extent that the present opinion deviates from this court's earlier pronouncement in American Export Lines, Inc. v. Revel, 266 F.2d 82 (4 Cir. 1959), we are of the view thatRevel has been overruled by Calbeck.
 
 
 [12]
 Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88 (1958)
 
 
 [13]
 We are of the opinion that the passage quoted above from Reed v. Yaka clearly proscribes the conclusion reached by the Fifth Circuit in Travelers Insurance Company v. Shea, 382 F.2d 344, 346 (1967), that "[s]ince there exists hybrid employment with labors terrestial and maritime and since state coverage does not preclude federal coverage [Calbeck], we do have the paradox of two workers doing the same type of work a few feet apart receiving injuries in the same way, yet treated as legal strangers. The paradox is not judicially soluble unless we extirpate the words `upon * * * navigable waters * * * (including any dry dock)' from the statutory commandment * * *."
 It is noteworthy that the court in Travelers v. Shea, supra, fails to analyze or consider the impact of Calbeck or Yaka on the Longshoremen's Compensation Act.
 
 
 [14]
 Dry docks were held to include the land surrounding them. See Newport News Shipbuilding & Dry Dock Co. v. O'Hearne,supra.
 
 
 [15]
 We recognize that this conclusion appears to be in conflict with that recently reached by the Second Circuit in Michigan Mutual Liability Co. v. Arrien, 344 F.2d 640, 644 (1965). Speaking for that court, Judge Kaufman stated: "A wharf or pier is usually built on pilings over whatwas navigable water. When the structure is completed, the water over which it is built is permanently removed from navigation as if the structure had been in the first instance built on land." With all deference, we find no support for this conclusion. It conflicts with the Supreme Court's holding that "when once found to be navigable, a waterway remains so." United States v. Applachian Electric Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).
 The generally accepted test of navigability was laid down by the Court in The Daniel Ball, 10 Wall. 557, 77 U.S. 557, 563, 19 L.Ed. 999 (1870), as follows: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." (Emphasis added.) More recently, the Supreme Court declared that "[t]he fact * * * that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state." Economy Light and Power Co. v. United States, supra 256 U.S. at 118, 41 S.Ct. at 411. See Montello, 20 Wall. 430, 87 U.S. 430, 431 (1874) ("If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact * * *."); Ingram v. Associated Pipeline Contractors, Inc., 241 F.Supp. 4 (E.D.La. 1965); Madole v. Johnson, 241 F.Supp. 379 (W.D.La.1965).
 In light of these cases, Judge Waterman, also of the Second Circuit, concluded that a body of water is "navigable water" if "(1) it presently is being used or is suitable for use, or (2) it has been used or was suitable for use in the past, or (3) it could be made suitable for use in the future by reasonable improvements." Rochester Gas and Electric Corp. v. F. P. C., 344 F.2d 594 (1965). Certainly the waters in the instant case were navigable prior to the construction of the piers, will again be open to unlimited navigation if the piers are ever removed, and most relevantly, are now used in navigation. We would say, therefore, that the waters flowing beneath the piers upon which these accidents occurred are navigable in fact. Cf. Nicholson v. Calbeck, 385 F.2d 221 (5 Cir. 1967).
 
 
 
 30
 HAYNSWORTH, Chief Judge, with whom BOREMAN, Circuit Judge, joins (dissenting):
 
 
 31
 I concur in the affirmance of Marine Stevedoring Corporation v. Oosting, in which the longshoreman met his death by drowning, but I respectfully dissent in the other cases, in which the longshoremen died or were injured on the dock. When construing a statute, as we are, it is not for us heedlessly to pursue our own notion of what the congressional judgment should have been or to deal cavalierly with restrictions specified by Congress. Nor do we serve the purpose of eliminating incongruity by transferring it elsewhere in multiplied form and creating a vast area of uncertainty which can only be resolved by extensive litigation.
 
 
 32
 I had thought there could be little doubt about the intention of the Congress when it enacted the Longshoremen's and Harbor Workers' Compensation Act in 1927. Until then, longshoremen were covered by the compensation act of the state in which they were working as long as they were on the dock, but they had no such protection when they were on the ship or a gangplank. Twice the Congress attempted to extend state compensation statutes to longshoremen when aboard a ship on navigable waters or on a gangplank between such a ship and the dock,[1] a result which would at least, have put all long-shoremen in the same state on a parity, but the Supreme Court, having earlier held that a state compensation act could not reach such a person,[2] struck down each statute as an unlawful delegation of congressional legislative power.[3] It was this very limited purpose to secure the benefits of some compensation system to longshoremen while working aboard a ship or while passing between the ship and the dock that prompted the Congress to enact its own compensation act when its attempts to extend the state statutes had been frustrated.
 
 
 33
 This purpose was clearly expressed in § 3 of the Act.[4] in which compensation protection was extended to injuries "occurring upon the navigable waters of the United States (including any drydock)" the limit of admiralty tort jurisdiction as it was then understood,[5] "and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." The use of the words "upon the navigable waters of the United States" was clearly referable to the prior history of the problem deriving from the Supreme Court's decision in Southern Pacific Co. v. Jensen, supra n.2, and the additional caveat that the injury be beyond the constitutional power of the states to compensate would seem to foreclose any doubt about the congressional intention in 1927.[6]
 
 
 34
 If there is any doubt about the congressional intention in the language of the statute, any notion that dockside injuries were intended to be covered is foreclosed by the legislative history. This was the third attempt to fill the void the Supreme Court's decisions had delineated. Congress sought to do no more. That purpose could hardly have been made more explicit than by the language in the Senate Report No. 973, 69th Cong., 1st Sess. 16, in which it was stated, "injuries occurring in loading or unloading are not covered unless they occur on the ship or between the wharf and the ship so as to bring them within the maritime jurisdiction of the United States."
 
 
 35
 It is true, of course, that a remedial statute such as the Longshoremen's and Harbor Workers' Compensation Act should be liberally construed to achieve its purpose, but not to pervert it. This one has been appropriately construed. The liberality with which it has been construed is exemplified by such cases as those holding that a marine railroad is a drydock within the drydock inclusion,[7] that injuries sustained upon or after contact with the water are within the coverage of the statute even though the longshoreman was on the dock before falling or being propelled into the water,[8] by those cases holding the federal act applicable to workers aboard the floating hull of a vessel under construction,[9] or aboard the grounded hull of a decommissioned vessel being dismantled,[10] and to workers engaged in the construction or repair of drydocks,[11] and by those other cases which have attempted to bridge the fine line drawing the boundary between the reach of the federal and the state statutes.[12] It is significant, however, that in all of these cases outside of the drydock inclusion, the employee's injuries were suffered on the seaward side of the wharf's edge or resulted from an event occurring when the employee was aboard a ship, whether or not commissioned, or while in the act of passing between the ship and the dock. Strictly dockside injuries suffered on the dock as a result of forces exerted there have not been held to be covered. There has thus been a liberal interpretation of the congressional intention as expressed in the Senate Report, but the cases are consistent with that expression of intention.
 
 
 36
 To a limited extent some of the cases read out of the statute the limitation that the injury be beyond the power of the state to compensate, but the excision of that proviso was very restricted and partial, and done solely for the purpose of avoiding uncertainties and the loss of rights through an erroneous choice of remedy. Thus the federal statute and the state statute are both allowed to apply in the narrow area of the dock's edge where either statute arguably may be said to apply,[13] but nothing the Supreme Court said in Calbeck or elsewhere suggests that, contrary to the plainly expressed intention of the Congress, the reach of the federal statute may be extended to injuries which are clearly on the dockside of the line. The Calbeck opinion, itself, limits its applicability to injuries on navigable waters within the area delineated by Jensen, Knickerbocker and Dawson, and by those cases made questionable.[14]
 
 
 37
 In this scheme of things, of course, there is some incongruity when a member of a stevedoring crew injured on the dock is covered by the state statute while a member of the same crew injured on the ship is covered by the federal, and, if, during the day, the same fellow works part of the time on the ship and part of the time on the dock, he passes from one jurisdiction to the other, but he is never without the protection of one statute or the other. The scheme has, at least, the virtue of as large an amount of certainty as could be provided in any division of authority. The edge of the dock is as clear a line as could be drawn. Except in the very rare case, there will be no doubt as to the remedy to be pursued, and doubtful cases need occasion little litigation. If the line is moved shoreward of the dock's edge, short of inclusion of every longshoreman wherever he may be and however he may be injured, it is bound to be vague and fuzzy and a fruitful source of contention and litigation, a circumstance quite inconsistent with the highly desirable certainty which should accompany any system of workmen's compensation.
 
 
 38
 We, as judges, may think that it would be nice and equitable if all longshoremen were provided compensation protection by the same act, so that each would receive the same benefits from the same administrative agency wherever and however he was injured. That is one of the three alternative theories the majority employs to reach its conclusion but the "status theory," as opposed to the "situs theory," has been firmly rejected by every court that has ever considered it[15] until now the majority embraces it. There is some support for the theory that coverage of the Compensation Act expanded with the expansion of admiralty's tort jurisdiction,[16] but not for the majority's conclusion that the Compensation Act was initially intended, or later grew, to be coextensive with the admiralty's contract jurisdiction. The phrasing of the statute, as well as its history, shows a rejection, not an adoption, of the suggestion of the Department of Labor that the contract be covered rather than places. Had it been intended to adopt the contract theory, the statutory language "on the navigable waters" could hardly have been more inappropriate for effectuation of that intention. The words, introduced as a substitute for the words, "within the admiralty jurisdiction," require a "situs" approach, as all courts have held or assumed, not a "status" approach.
 
 
 39
 Next it is said by the majority that the compensation statute was amended by the Admiralty Extension Act of 1948,[17] which extended the admiralty tort jurisdiction to injuries sustained on land, provided they were caused by a vessel on navigable waters. The Ninth Circuit has rejected this theory in a recent case[18] in which the Supreme Court denied certiorari just three months ago.[19] As Judge Watkins pointed out in one of the opinions from which these appeals come,[20] no such intention is evident in the Admiralty Extension Act, its legislative history or the subsequent legislative history of the Compensation Act. The Admiralty Extension Act contains no reference to the Compensation Act, and five days after enactment of the Admiralty Extension Act the Compensation Act was amended to increase the benefits payable,[21] but neither in that amendment nor in any of its legislative history is there any reference to the Admiralty Extension Act. Bearing in mind the initial deliberate choice of the Congress to substitute the words "upon the navigable waters" as the definition of the covered injuries for the words "within the admiralty jurisdiction,"[22] as was first proposed in 1927 when the Compensation Act was enacted, a holding that the Admiralty Extension Act enlarged the scope of the Compensation Act appears a judicial ukase without legislative support.
 
 
 40
 Finally, the majority attempts to support its conclusion on the theory that the waters beneath the piers in these cases were navigable, because it either appears or it is assumed that they could be traversed by a skiff or a canoe, which leads them to the conclusion that an injury on the dock above such waters is "upon the navigable waters of the United States." This theory, of course, flies in the face of the settled doctrine that the pier is an extension of the land.[23] It has been specifically rejected by the Fifth Circuit in two very recent cases,[24] in which the Supreme Court denied certiorari only five months ago.[25] Again, it seems to me wholly inconsistent with the congressional mandate which governs us and the clearly expressed congressional intention.
 
 
 41
 If the majority's conclusion may be thought to be justified by its statement of the desirability of elimination of incongruity, consider the barrel of incongruities its opinion will create.
 
 
 42
 A longshoreman working on a quay or wharf at the harbor's edge and beneath which no waters flow but to which a vessel being loaded is tied, would not be covered by the federal statute under the third theory adopted by the majority, though one working nearby upon that portion of a pier which is seaward of high water would be covered. On the same pier a longshoreman would be covered if he was on the seaward side of high water when hurt and not covered if he were not. Under the status theory a longshoreman would be covered wherever he was injured, even several miles from the water on an errand to pick up supplies and however he was hurt, but on the Admiralty Extension Act amendment theory he would not be covered even though working on a pier beneath which waters flow, unless his injury was caused by the vessel or by some equipment appurtenant to the vessel. Is he covered under the majority's conclusion if he is working on a pier beneath which waters flow and not covered if he is working on a quay? Is he covered if his injuries are caused by a shore-based crane engaged in loading the ship, but not covered if he is struck by a switch engine moving empty freight cars? Is he covered when struck down by an automobile on a street while on the way to get supplies from a stevedore's warehouse? Since the contract theory would bring all longshoremen within the coverage of the Act, reference to the other theories suggests that coverage would exist only if the circumstances satisfied all three of them. Would any two suffice?
 
 
 43
 The majority answers none of these questions. I would not suppose it appropriate that they now undertake to do so, but they illustrate the multitude of incongruities they would substitute for those they seek to eliminate and the extensive uncertainty they introduce in an area in which costly and prolonged litigation ought not to be necessary to ascertain the appropriate remedy.
 
 
 44
 Congress, if it wishes, may amend the statute to extend its coverage in a rational way to some point of reasonable certainty. The Court in deciding specific cases can achieve no such comprehensive result, and its attempt to do so is a grave distortion of the statute which seems to me plainly to limit us and to provide for compensation only for injuries suffered arguably on the seaward side of the edge of the dock.
 
 
 45
 Though the Supreme Court's decision in Davis v. Department of Labor and Industries, supra n. 12, "astonished, bewildered and occasionally outraged the legal profession,"[26] it served the very practical purpose of eliminating confusion within the defined twilight zone, confusion which the Supreme Court rightly regarded as unfair to employers and employees alike. Now we take the other road to spread confusion where none existed before and to sow vast thickets of controversy and litigation which no system of workmen's compensation can afford.
 
 
 
 Notes:
 
 
 [1]
 Act of October 6, 1917, 40 Stat. 395; Act of June 10, 1922, 42 Stat. 634
 
 
 [2]
 Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086; Clyde S.S. Co. v. Walker, 244 U.S. 255, 37 S.Ct. 545, 61 L.Ed. 1116
 
 
 [3]
 Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646; Knickerbocker Ice Co. v. Stewart, 253 U. S. 149, 40 S.Ct. 438, 64 L.Ed. 834
 
 
 [4]
 33 U.S.C.A. § 903
 
 
 [5]
 Crowell v. Benson, 285 U.S. 22, 55, 52 S.Ct. 285, 76 L.Ed. 598; Nogueira v. New York, N.H. & H. R.R. Co., 281 U.S. 128, 133, 138, 50 S.Ct. 303, 74 L.Ed. 754; Washington v. W. C. Dawson, 264 U.S. 219, 227, 235, 44 S.Ct. 302; State Industrial Commission of State of New York v. Nordenholt Corp., 259 U.S. 263, 273, 42 S.Ct. 473, 66 L.Ed. 933; Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 59-60, 34 S.Ct. 733, 58 L.Ed. 1208; Cleveland Terminal & Valley R.R. Co. v. Cleveland S.S. Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508
 
 
 [6]
 I recognize, of course, that the qualification that the injury be beyond the constitutional reach of state compensation acts may have been inserted for the purpose of demonstrating the congressional intention of remaining within the assumed limits of congressional power, De Bardeleben Coal Corp. v. Henderson, 5 Cir., 142 F.2d 481, and that it was disregarded in thattour de force, which provided a highly practical, but "theoretic[ally] illogic[al]" solution to the problem of the "twilight zone" in which both the federal and the state statutes arguably may be said to apply. Davis v. Department of Labor and Industries, 317 U.S. 249, 259, 63 S.Ct. 225, 87 L.Ed. 246. Since our task is to define congressional intention, however, the words have an obvious and cogent relevance.
 
 
 [7]
 Avondale Marine Ways, Inc. v. Henderson, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77; Holland v. Harrison Bros. Drydock & Ship Repair Yard, Inc., 5 Cir., 306 F. 2d 369; Western Boat Bldg. Co. v. O'Leary, 9 Cir., 198 F.2d 409; Maryland Cas. Co. v. Lawson, 5 Cir., 101 F.2d 732; Continental Cas. Co. v. Lawson, 5 Cir., 64 F.2d 802But see O'Leary v. Puget Sound Bridge & Drydock Co., 9 Cir., 349 F.2d 571.
 
 
 [8]
 O'Keeffe v. Atlantic Stevedoring Co., 5 Cir., 354 F.2d 48; Interlake S.S. Co. v. Nielsen, 6 Cir., 338 F.2d 879; Puget Sound Bridge & Dry Dock Co. v. O'Leary, 260 F.Supp. 260 (W.D.Wash.1966); Beasley v. O'Hearne, 250 F.Supp. 49 (S.D. W.Va.1966); Gulf Oil Corp. v. O'Keeffe, 242 F.Supp. 881 (E.D.S.C.1965); Thomsen v. Bassett, 36 F.Supp. 956 (W.D. Mich.1940). These are the cases that justify the affirmance of the award in Marine Stevedoring Corp. v. Oosting
 
 
 [9]
 Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368
 
 
 [10]
 Boston Metals Co. v. O'Hearne, 4 Cir., 329 F.2d 504
 
 
 [11]
 Newport News Shipbuilding & Dry Dock Co. v. O'Hearne, 4 Cir., 192 F.2d 968; Travelers Ins. Co. v. McManigal, 4 Cir., 139 F.2d 949; Travelers Ins. Co. v. Branham, 4 Cir., 136 F.2d 873
 
 
 [12]
 Davis v. Department of Labor and Industries, 317 U.S. 249, 63 S.Ct. 225; Parker v. Motor Boat Sales, 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184; Michigan Mut. Liab. Co. v. Arrien, 2 Cir., 344 F.2d 640; Taylor v. Baltimore & Ohio R.R. Co., 2 Cir., 344 F.2d 281; De Bardeleben Coal Corp. v. Henderson, 5 Cir., 142 F.2d 481; L'Hote v. Crowell, 5 Cir., 54 F.2d 212; Dixon v. Oosting, 238 F.Supp. 25 (E.D.Va.1965); Machillo v. New York Cent. R.R. Co., 200 F.Supp. 805 (S.D.N.Y. 1962); Caldaro v. Baltimore & Ohio R.R. Co., 166 F.Supp. 833 (E.D.N.Y. 1958); West v. Erie R.R. Co., 163 F. Supp. 879 (S.D.N.Y.1958); Ford v. Parker, 52 F.Supp. 98 (D.Md.1943); Richards v. Monahan, 17 F.Supp. 252 (D. Mass.1936)
 
 
 [13]
 Moores' Cases, 323 Mass. 162, 80 N.E. 2d 478 (1948),Aff'd sub nom. Bethlehem Steel Co. v. Moores, 335 U.S. 874, 69 S.Ct. 239, 93 L.Ed. 417. See also Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196; Baskin v. Industrial Accident Commission, 338 U.S. 854, 70 S.Ct. 99, 94 L.Ed. 523; Davis v. Department of Labor and Industries, 317 U.S. 249, 63 S.Ct. 225.
 
 
 [14]
 370 U.S. 114, 126-127, 82 S.Ct. 1196
 
 
 [15]
 Travelers Ins. Co. v. Shea, 5 Cir., 382 F.2d 344; O'Keeffe v. Atlantic Stevedoring Co., 5 Cir., 354 F.2d 48See also Houser v. O'Leary, 9 Cir., 383 F.2d 730. But see Holland v. Harrison Bros. Dry Dock & Ship Repair Yard, Inc., 5 Cir., 306 F.2d 369, 373 n. 4.
 
 
 [16]
 See Michigan Mut. Liab. Co. v. Arrien, 233 F.Supp. 496 (S.D.N.Y.1964); Boston Metals v. O'Hearne, 1964 A.M.C. 2351 (D.Md.1963). The issue was not reached on appeal in either case
 
 
 [17]
 46 U.S.C.A. § 740
 
 
 [18]
 Houser v. O'Leary, 9 Cir., 383 F.2d 730
 
 
 [19]
 Houser v. O'Leary, 390 U.S. 954, 88 S.Ct. 1047, 19 L.Ed.2d 1147
 
 
 [20]
 Johnson v. Traynor, 243 F.Supp. 184, 190-192 (D.Md.1965)See also Travelers Ins. Co. v. Shea, 5 Cir., 382 F.2d 344, 349-350, cert. denied McCollough v. Travelers Ins. Co., 389 U.S. 1050, 88 S. Ct. 780, 19 L.Ed.2d 842, approvingly quoting Judge Watkins' reasoning.
 
 
 [21]
 62 Stat. 602
 
 
 [22]
 Had those words been adopted by the Congress, they would furnish some basis for the majority's contract theory; their rejection by the Congress refutes the theory
 
 
 [23]
 Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045; Minnie v. Port Huron Terminal Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631; T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S. Ct. 228, 72 L.Ed. 520; State Industrial Commission of State of N. Y. v. Nordenholt Corp., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933; Cleveland Terminal & Valley R.R. Co. v. Cleveland S.S. Co., 208 U.S. 316, 28 S.Ct. 414; The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125; Houser v. O'Leary, 9 Cir., 383 F.2d 730,cert. denied 390 U.S. 954, 88 S.Ct. 1047; O'Keeffe v. Atlantic Stevedoring Co., 5 Cir., 354 F.2d 48; Michigan Mut. Liab. Co. v. Arrien, 2 Cir., 344 F.2d 640; Hastings v. Mann, 4 Cir., 340 F.2d 910; Wiper v. Great Lakes Engineering Works, 6 Cir., 340 F.2d 727; American Export Lines, Inc. v. Revel, 4 Cir., 266 F.2d 82; O'Loughlin v. Parker, 4 Cir., 163 F.2d 1011; Johnston v. Marshall, 9 Cir., 128 F.2d 13; Benedict on Admiralty § 29 (6 ed.); Gilmore & Black, The Law of Admiralty § 6-46 (1957 ed.); Robinson on Admiralty § 11 (1939 ed.).
 
 
 [24]
 Nicholson v. Calbeck, 5 Cir., 385 F.2d 221; Travelers Ins. Co. v. Shea, 5 Cir., 382 F.2d 344
 
 
 [25]
 Nicholson v. Calbeck, 389 U.S. 1051, 88 S.Ct. 790, 19 L.Ed.2d 843; McCollough v. Travelers Ins. Co., 389 U.S. 1050, 88 S. Ct. 780
 
 
 [26]
 Gilmore & Black, The Law of Admiralty 349 (1957 ed.)